UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Crim. No. 05-10003-NMG |
| ) | |
| v. ) | |
| ) | |
| ARTHUR GIANELLI, ) | |
| JOSEPH YERARDI, JR., ) | |
| DENNIS ALBERTELLI A/K/A "FISH," ) | |
| PHILIP PUOPOLO, ) | |
| SALVATORE RAMASCI A/K/A "LEFTY," ) | |
| FRANK IACABONI, ) | |
| RANDY ALBERTELLI, ) | |
| STEPHEN RUSSO A/K/A "MOON," ) | |
| MICHAEL PINIALIS A/K/A "MAX," ) | |
| ENEYDA GONZALEZ RODRIGUEZ, ) | |
| MARY ANN GIANELLI, ) | |
| GISELE ALBERTELLI, and ) | |
| RAFIA FEGHI A/K/A RAFIA YERARDI, ) | |
| ) | |
| Defendants. ) | |

## SECOND AFFIDAVIT OF NUNZIO ORLANDO IN SUPPORT OF PRETRIAL DETENTION OF PHILIP PUOPOLO

I, Nunzio S. Orlando, under penalty of perjury, state:

1.      This affidavit supplements the affidavit that I signed on September 21, 2006 (which was filed on September 22, 2006) in support of the government's motion for pretrial detention of defendant Philip Puopolo, and is filed in response to Puopolo's Motion for Release from Pre-Trial Detention and the letters filed as exhibits to Puopolo's motion.

2.      On page 2 of his motion, Puopolo states that "[h]e has *five* children ranging in age from 8 to 27, all of whom reside locally" and that the letters attached to his motion "vouch for Mr. Puo[po]lo's character...." (Emphasis added.)   However, the last of those letters, an unsigned

submission from "THE PUOPOLO CHILDREN," recites that Puopolo "has raised *four* successful children." (Emphasis added.)

3.     As set forth in paragraphs 48, 58, and 59 of my September 21, 2006 affidavit, Puopolo does indeed have a fifth child. Contrary to the statement in Puopolo's motion, this child is not eight years old, but is only seven years old, having been born on June 11, 1999 (as set forth in the Judgment of Paternity). Since May 17, 2000, Puopolo has been subjected to a permanent restraining order forbidding him from abusing, contacting, or coming near that child. Moreover, Puopolo on September 12, 2006 -- just two weeks ago -- was adjudged in contempt of court for repeatedly failing to pay $150 weekly in child support, as ordered by the state court.

4.     Attached to Puopolo's motion is a letter from Paula Nigro, who recites that she has been "engaged to [Puopolo] for seven years," and describes Puopolo as "kind, respectful and a gentleman" who is "gentle, soft-spoken, intelligent, kind and always respectful and loving," and "a person of moral character" -- so much so, that Ms. Nigro asks this Court to "release Phil to my custody and I will put my reputation on the line to the courts that Phil is not a threat to anyone."

5.     Ms. Nigro's carefully crafted description of Puopolo in her letter to this Court is completely inconsistent with her extemporaneous, candid comments in conversations intercepted pursuant to state court wiretap orders.

6.     For example, on January 9, 2005 in a conversation intercepted over telephone line 339-226-0834 at approximately 1:11 p.m., Paula Nigro accused Puopolo of having abused her.

Nigro said that Puopolo is a criminal and belongs in jail. Nigro added that Puopolo has never worked a day in his life and brags about it.[1]

7.    Paula Nigro's knowledge of Puopolo's illegal activities is illustrated, for example, by calls intercepted over 781-289-0600 on January 28, 2005 at approximately 5:11 p.m., and on January 29, 2005 at approximately 1:38 p.m., in which Puopolo discusses his illegal video gaming machine business with Nigro.

8.    On pages 2 and 5 of his motion, Puopolo characterizes the charges against him in the indictment as "little more than a state bookmaking charge on steroids," and he asserts on page 6 that the maximum he faces under the gaming charges is two years. Both assertions are mistaken.

9.    Puopolo is charged not only with two counts of transmission of wagering information under 18 U.S.C. §§ 1084 and 2, for which the maximum prison term per count is two (2) years, but also with:

      a.    two counts of operating an illegal gambling business, 18 U.S.C. §§ 1955 and 2, each of which has a five (5) year maximum prison term;

      b.    two counts of witness tampering, 18 U.S.C. § 1512, each of which has a ten (10) year maximum prison term;

---

[1]    In paragraph 53 of my September 21, 2006 affidavit, I stated that Puopolo lives alone. I believe that to be accurate based upon (a) wiretapped conversations from 2005 showing that Puopolo and Nigro were living in separate locations; (b) a visit that I made to Nigro's residence at 655 Revere Beach Boulevard during 2005; and (c) the fact that Registry of Motor Vehicles records currently reflect that Nigro uses Puopolo's address -- 350 Revere Beach Boulevard -- as Nigro's mailing address, but that Nigro's own residential address is listed as 655 Revere Beach Boulevard.

c.      five substantive and five conspiracy counts of <u>extortionate collection of credit</u>, 18 U.S.C. §§ 894 and 2, and one count of <u>extortionate extension of credit</u>, 18 U.S.C. § 892, each of which has a twenty (20) year maximum prison term; and

d.      a <u>racketeering (RICO)</u> conspiracy count and a racketeering (RICO) substantive count, 18 U.S.C. § 1962, each of which has a twenty (20) year maximum prison term; and the RICO counts not only charge numerous predicate acts, but also fourteen (14) instances of <u>collection of unlawful debt</u>.

10.     Without elaboration, Puopolo contends on page 6 of his motion that his Sentencing Guidelines range if convicted on all counts would not be more than 57 to 70 months. While that is a substantial sentence for someone of Puopolo's age, I have been informed that the Sentencing Guidelines would actually result in a sentencing range of 108-135 months:

a.      five separate extortionate collections of credit and one extortionate extension of credit:  base offense level of 20 under Sentencing Guidelines § 2E2.1(a);

b.      two illegal gambling businesses: base offense level of 12 under § 2E3.1;

c.      grouping under § 3D1.4 adds 5 levels = offense level of 25;

d.      obstruction of justice[2] adds 2 levels under § 3C1.1 = offense level of 27

e.      role in offense adds 4 levels under § 3B1.1 = offense level 31

11.     On page 6 of his motion, Puopolo suggests that the proof of his involvement in the extortionate collection from John Mousis is based only upon testimony from Joseph Mercurio.

---

[2]      This adjustment was erroneously omitted in the calculation to which I referred in paragraph 14 of my September 21, 2006 affidavit.

However, as I indicated in paragraphs 19, 25, 27, and 28 of my September 21, 2006 affidavit, the government also will offer testimony at trial from John Mousis and from Trooper Russolillo.

12.    Moreover, as I indicated in paragraph 16(c) of my September 21, 2006 affidavit, the government will offer proof of the other extortionate collections charged in the indictment from witnesses including the respective victims.

13.    For example, Puopolo also used Joseph Mercurio to intimidate Billy Meehan, and Puopolo personally left a threatening message on Meehan's answering machine, as recorded on a state wiretap on January 28, 2005 at approximately 10:20 a.m. (with Puopolo calling from the RBA phone, 781-289-0600).

14.    Puopolo seems to contend on page 6 of his motion that my account of the violent assault that Puopolo committed in 1990 -- discussed in paragraphs 40-42 of my September 21, 2006 affidavit -- is "fiction."  However, I did not rely merely upon a police report from 1990, but also upon an interview during September 2006 of the victim.

15.    Puopolo's violent streak has continued.  For example, in an intercepted conversation on December 12, 2004 at approximately 10:46 a.m. over 781-244-9606, Puopolo stated that the night before, he had beaten up another individual, apparently a person known as Bobby Dell.  Puopolo stated that although he at first felt bad about leaving the victim with blood gushing from his head, Puopolo no longer felt bad because the morning after the beating, Puopolo found that his car had been "keyed," and he presumed that the victim of his beating had keyed the car.

16.    With regard to the likelihood that Puopolo was involved in one or more of the as yet uncharged arsons discussed in paragraphs 45-47 of my September 21, 2006 affidavit (see Puopolo's motion at page 7):

a.      During 2003, defendant Arthur Gianelli was attempting to extort majority control of the Canine Entertainment Corporation from Mark Colangelo and others.  Gianelli's associate, defendant Dennis Albertelli, contacted defendant Deeb Homsi, a former member of the Hell's Angels, who in turn hired Michael McCormack and Sean Slater to set an arson fire by the Big Dog Sports Grille in North Reading, another business of Colangelo's.  However, the State Police learned of the conspiracy through a state wiretap, and on November 13, 2006, we arrested McCormack and Slater at the scene, and we contacted the fire department which immediately extinguished the fire before it could do significant damage.

b.      Another arson fire occurred by the same location less than two weeks later, around 5 o'clock in the morning on November 26, 2003.  This is one of the uncharged arsons that I mentioned in my September 21, 2006 affidavit.

c.      As it happens, the FBI was conducting a separate investigation, as a result of which it was conducting physical surveillance on November 26, 2003 and observed Philip Puopolo and a male passenger drive away from the Revere Businessmen's Association at approximately 9:40 a.m. and go to North Reading.  On the way, Puopolo made several U-turns, apparently in an attempt to discover or foil any physical surveillance.  The FBI had surveilled Puopolo on other occasions but had not previously seen him going to North Reading.  Puopolo drove to Rustic Lane and made a U-turn at the North Reading Medical Association, which is on Route 28, just off of Rustic Lane.  The North Reading Medical Association is diagonally across the street from the Big Dog.  Puopolo stopped for a few moments, and then headed back south to the RBA, but using a different route.  I believe that Puopolo went to see how much damage the arson fire had achieved.

d.      A week later, on December 3, 2003, another arson fire occurred at another business with which Colangelo was involved:  the Sports Grille in Boston.

e.      On December 5, 2003, at approximately 9:33 a.m., defendant Salvatore Ramasci made a wiretapped telephone call to Puopolo at the RBA, so that Ramasci could arrange a meeting to settle up regarding money that Puopolo owed to Ramasci's boss, defendant Arthur Gianelli, concerning illegal bookmaking.  Ramasci was under the impression that he was supposed to be collecting money from Puopolo that week. However, Puopolo said, "Ah, well, well do you know what's going on again?  It's just like last week. You know what I mean, my friend?" Ramasci responded, "Oh, I wasn't aware of that. Okay."  Puopolo then said, "Yeah, so just check with him with the ah, take, take ah, with my fee, he'll tell you what it is.  Take my fee with what his thing will be, capisci?"  I believe that Puopolo was conveying that he (Puopolo) was to be credited with whatever fee he was to receive from Gianelli for the arson.

f.      However, later that same day, On December 5, 2003, at approximately 1:49 p.m., Arthur Gianelli made a wiretapped call to Puopolo at the RBA, during which Puopolo stated, "On that thing there, ah, no pay, capisci?  So, I'll talk to you when I see you, but don't worry about sending no fucking money down here. Fuck them in the ass!  It wasn't, it wasn't what it was supposed to be.  Capisci?"  I believe that Puopolo was conveying that Gianelli did not need to pay Puopolo for the December 3, 2003 Boston Sports Grille arson because the crime was not committed properly -- not having done sufficient damage.

g.      There was another arson fire at the Boston Sports Grille the following day, December 6, 2003.

17.     Puopolo also complains on page 7 of his affidavit about my account (in paragraphs 43-44 of my September 21, 2006 affidavit) of the attempted shooting and the completed stabbing of George Paone.  As I indicated, Paone knew at the time who his assailants were, but lied to the police out of fear.  Puopolo had set up the crime so that Paone would not know that Puopolo was behind it.  However, during 2006, one of the assailants revealed his own role (which Paone subsequently corroborated), and the assailant explained that he was hired by Puopolo to commit the assault on Paone.

18.     Puopolo suggests on pages 8-9 of his motion that if released, he would obey an order to "keep away ... from everyone on a list of witnesses that the government provides."  Aside from the facts that (a) just two weeks ago, Puopolo was found in contempt of a state court for flouting its lawful order, and (b) Puopolo stands indicted for *already* having tampered with two witnesses in this federal criminal investigation, there is no reason why the government should be required to "telegraph" to Puopolo which other witnesses the government may contact or re-contact in the future who may be in a position to offer truthful testimony against him.

19.     Puopolo's utter disdain and contempt for the law is exemplified in a January 25, 2005 conversation at approximately 9:56 a.m. over 781-289-0600, in which Puopolo bragged to Paula Nigro about Puopolo cheating on his taxes.  Puopolo said that if he even bothered to file a tax return, he would show only about $10,000 in income -- and in the next breath, Puopolo noted that he had lost $10,000 on the Patriots on the previous Sunday.  Puopolo added that a particular business gives Puopolo phony pay checks -- all of which are voided when Puopolo receives them -- enabling Puopolo to receive health insurance coverage and to pretend that he has a lawful source of income.

20.   I have reviewed the letters that Puopolo attached to his motion.  I note that retired Lt. Penta "never heard of [Puopolo] being in trouble," which is remarkable given Puopolo's arrest record and restraining order.  Wiretapped conversations (such as on 781-289-0600 on February 6, 2005 at approximately 5:51 p.m. and 6:10 p.m.) reveal that James Penta, a/k/a "Ice Cream" and Paul Ricci (who I believe is a close relative of Janice Ricci) have placed illegal bets with Puopolo.

21.   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 26, 2006.

Trooper Nunzio S. Orlando
Massachusetts State Police