United States District Court
District of Massachusetts

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** ) | | |
| ) | | |
| v. ) | | |
| ) | Criminal Action No. | |
| **FRANK IACABONI,** ) | 05-10003-NMG-3 | |
| ) | | |
| Defendant. ) | | |
| ) | | |

**MEMORANDUM & ORDER**

**GORTON, J.**

In November, 2009, Frank Iacaboni ("Iacaboni" or "petitioner") was sentenced to 183 months in prison and 36 months of supervised release after being convicted of RICO conspiracy, arson, extortion and gambling offenses. Iacaboni contends that his lawyer rendered ineffective assistance during trial and moves to vacate his sentence pursuant to 28 U.S.C. § 2255. For the reasons that follow, petitioner's motion will be denied without an evidentiary hearing.

## I. Background

### A. The wiretaps

Iacaboni's prosecution resulted from an investigation of an extensive illegal gambling operation by the Massachusetts State Police ("the MSP") in 2003. The MSP obtained orders to intercept telephone conversations of co-defendants Arthur Gianelli ("Gianelli"), the head of the group, and Dennis

Albertelli ("Albertelli"), the second-in-command, between October 31, 2003 and mid-January, 2004.

The intercepted calls revealed that Gianelli and Albertelli were involved in a dispute with Mark Colangelo ("Colangelo") over ownership of the Big Dog Sports Bar in Lynnfield, Massachusetts. Gianelli and Albertelli intended to pressure Colangelo to settle on terms favorable to themselves by burning down Romeo's Pizza, Colangelo's pizza shop in North Reading, Massachusetts.

Based on a series of intercepted telephone calls between November 5, 2003 and November, 11, 2003 ("the arson calls"), the MSP concluded that Iacaboni was involved in the planning of the arson. Investigators learned through the arson calls that Iacaboni requested and secured a diagram of the building from Albertelli. The following day, Iacaboni indicated to Albertelli that he had recruited an arsonist and discussed with that man specific plans for burning the building.

On November 13, 2003, officers set up surveillance at Romeo's Pizza and arrested two men attempting to set fire to the building. The men had been recruited by co-defendant Deeb Homsi ("Homsi").

**B. Subsequent arrest and jury trial**

Iacaboni was arrested in January, 2005 and charged with all five counts in the initial indictment which named four co-

defendants. At that point, the prosecution believed that Iacaboni had recruited Homsi, who in turn hired the two men to carry out the arson.

In September, 2006, Iacaboni was charged in nine of the 520 counts in the Second Superseding Indictment which named 13 co-defendants and four co-racketeers. The prosecution advanced a revised theory, alleging that Albertelli had recruited Homsi but also enlisted Iacaboni to provide an alternative to Homsi's crew, after which Iacaboni recruited a team of back-up arsonists to carry out the burning of Romeo's Pizza.

Following a seven-week jury trial in March and April, 2009, Iacaboni was convicted of eight counts, including RICO conspiracy, arson, extortion and gambling offenses. He was acquitted on the substantive RICO count.

**C. Procedural History**

Iacaboni appealed his conviction in November, 2009. In July, 2012, the First Circuit Court of Appeals affirmed his conviction and the United States Supreme Court subsequently denied Iacaboni's petition for writ of certiorari.

In May, 2014, Iacaboni timely moved for habeas relief under 28 U.S.C. § 2255. He claims that he received ineffective assistance of counsel because his retained trial lawyer, Thomas J. Butters ("Attorney Butters"), 1) failed to call petitioner to testify, 2) failed to consult and introduce testimony of an

expert forensic linguist, 3) failed to sufficiently cross-examine the sergeant responsible for supervising the wiretap investigations and 4) failed to draft a limiting instruction to minimize spillover prejudice.[1]  Petitioner contends that but for those errors, he likely would have been acquitted on all eight counts.

**II.  Analysis**

   **A.  Legal Standard**

Section 2255 enables a prisoner in custody to move the court that imposed his sentence to vacate, set aside or correct the sentence if it was 1) imposed in violation of the Constitution or laws of the United States or by a court that lacked jurisdiction, 2) in excess of the maximum authorized by law or 3) otherwise subject to collateral attack. 28 U.S.C. § 2255(a); David v. United States, 134 F.3d 470, 474 (1st Cir. 1998).  The petitioner bears the burden of establishing the need for relief in each of those circumstances. David, 134 F.3d at 474.  To be entitled to relief under § 2255, the petitioner must present "exceptional circumstances" that make the need for redress "evident." Id. (citing Hill v. United States, 368 U.S. 424, 428 (1962)).

---

[1] Attorney Butters has represented Iacaboni in cases pending in Massachusetts state and federal courts over the past 30 years. They are also close personal friends and their families have socialized together.

-4-

A § 2255 petition is procedurally defaulted and unreviewable on collateral attack when the petitioner has not presented the claim on direct appeal, lacks cause for failing to do so and suffered no "actual prejudice resulting from the error." Damon v. United States, 732 F.3d 1, 4 (1st Cir. 2013) (citing Bousley v. United States, 523 U.S. 614, 622 (1998)). Pleading constitutionally ineffective assistance of counsel is sufficient to excuse a procedural default. Prou v. United States, 199 F.3d 37, 47 (1st Cir. 1999).

To prevail on a claim of ineffective assistance of counsel under the Sixth Amendment, the petitioner must show that his representation by counsel 1) "fell below an objective standard of reasonableness" and 2) "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). That test is formidable.

> [J]udicial scrutiny of counsel's performance must be highly deferential [and] counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Id. at 689-90; see also Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (noting that petitioner must show that his "counsel's choice was so patently unreasonable that no competent attorney would have made it") (internal citation omitted).

**B. Application**

**1. Failure to call Iacaboni to testify**

Iacaboni asserts that he repeatedly requested Attorney Butters to call him to testify at trial in order to explain to the jury that he was "bullshitting" Albertelli and was simply pretending to be interested in helping with the arson. Petitioner contends that Attorney Butters dissuaded him from testifying and that amounted to constitutionally deficient representation. The Court disagrees.

Approximately one month before the trial began, Attorney Butters, his partner John Brazilian, their associate Matthew Thompson and Gianelli's attorney Robert Sheketoff conducted four practice cross-examination sessions with Iacaboni. Each round lasted between 30 minutes and an hour. Following the practice sessions, the attorneys unanimously concluded that Iacaboni would be better served by not testifying. Attorney Butters warned petitioner that if he testified, he would be subject to very harsh cross-examination by an Assistant United States Attorney that would reflect poorly on him in the eyes of the jurors. Counsel also told Iacaboni on multiple occasions that taking the stand would be too risky.

The time and effort devoted to the practice sessions by several defense attorneys do not reflect a simple "going-through-the-motions" to keep him happy, as the petitioner

suggests. They instead indicate that the decision not to have Iacaboni testify at trial was a coherent, strategic determination made in his best interest. Although the petitioner now insists that his live testimony would have withstood cross-examination and averted a guilty verdict, the Court concludes that the thoughtful and deliberate decision of his attorney prior to and during the trial "falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Moreover, even with the benefit of hindsight, petitioner has failed to support his claim that the alleged deficiency in his counsel's representation prejudiced the outcome.

Accordingly, Iacaboni has not demonstrated that Attorney Butters' failure to call him to testify satisfies either prong of the Strickland test.

### 2. Failure to call an expert forensic linguist

Iacaboni contends that Attorney Butters was seriously deficient when he failed to hire an expert to challenge the testimony of Special Agent Matthew Kelsch of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("Agent Kelsch"). If he had, says petitioner, he could have shown that Iacaboni had been "bullshitting" during the arson calls. Agent Kelsch provided lay testimony of his interpretation of the arson calls based on his direct involvement with the case investigation to

provide the jury an explanation of and context to the cryptic mannerisms often used among the co-defendants during the intercepted calls.

Emeritus Professor Ronald Butters ("Professor Butters" and no relation to the accused attorney) has been retained by petitioner and has submitted a report and a declaration in support of his habeas petition. Professor Butters opines that Iacaboni was bluffing about his agreement to participate in the arson plan because of, inter alia, 1) the change in demeanor of Albertelli and Iacaboni between their initial conversation on November 3, 2003 and the subsequent conversations on November 10 and 11, 2003, 2) the absence of discussion of money to pay Iacaboni's arsonists, 3) the fact that Albertelli was unusually reticent and spoke mostly in monosyllables and 4) Iacaboni's suggestion that the arson be postponed due to rain.

Citing persuasive case law, the government responds that Attorney Butters was not deficient in failing to consult a forensic expert prior to trial because courts consider such linguistic experts to be of dubious scientific value and their testimony is frequently found to be irrelevant and inadmissible. See, e.g., Tyson v. Keane, 159 F.3d 732, 736 n. 3 (2d Cir. 1998) (observing that "the federal courts have generally refused to admit linguistic discourse analysis." (citations and quotations omitted)).

Petitioner disputes the government's suggestion by asserting that expert forensic linguistic testimony has been admitted in the majority of cases in which it has been proffered. He cites the favorable statistics of an apparently prominent professor of linguistics whose forensic linguistic testimony was admitted in the majority of the 44 criminal cases in which he served as an expert.

The Court notes that even though police officers "commonly help interpret conversations by translating jargon common among criminals," expert forensic linguistic testimony does not appear to be regularly proffered to counter those interpretations. Albertelli, 687 F.3d at 446. More pertinent to this case is the response of Attorney Butters to Iacaboni's question regarding whether an expert could show that petitioner was not serious about arranging the arson. Attorney Butters, a well-respected defense attorney licensed for over 40 years, responded that he was unaware of any such expert testimony. At the very least, that answer is indicative of the fact that forensic linguistic experts are not consulted as a matter of course to counter interpretations of wiretapped conversations put forth by the prosecution. Petitioner has not shown that his counsel's failure to do so constitutes objectively unreasonable performance.

Petitioner also cites Dugas v. Coplan, 428 F.3d 317, 330 (1st Cir. 2005) in which trial counsel was held to have provided ineffective assistance in large part because he failed to consult with an arson expert to support the defense that the fire at issue was not the result of arson. The court specifically noted that counsel "lacked any knowledge of arson investigation" and an arson expert would have conducted an independent characterization of the fire scene supported by "scientific conclusions." Id. at 329-30.

Dugas is distinguishable in two respects. First, the government in that case presented multiple experts to support their claim that arson caused the fire. Countering such a conclusion would more likely require expert testimony, particularly because defense counsel had no experience with the matter. Here, Agent Kelsch testified as a lay witness with respect to his interpretation of the conversations recorded in the wiretaps. Albertelli, 687 F.3d at 447. Although he based his testimony on knowledge developed through his involvement with the investigation, he was not testifying to scientific conclusions. Even if Agent Kelsch had testified as an expert witness, the failure to call a rebuttal expert would not amount to ineffective assistance because

> [a] defendant's lawyer does not have a duty in every case to consult experts even if the government is proposing to put on expert witnesses.

Miller v. Anderson, 255 F.3d 455, 459 (7th Cir.) remand order modified by stipulation, 268 F.3d 485 (7th Cir. 2001).

Second, Attorney Butters had the benefit of his own client to interpret his conversations and he used that knowledge to cross-examine Agent Kelsch, to discredit the government's interpretation of the arson calls and to convey the purported true meaning behind the conversations.

Attorney Butters in fact forcefully challenged the government's interpretation of the arson calls throughout the trial. Iacaboni's position that he had invented non-existent arsonists to placate Albertelli until he abandoned the arson plan was fully conveyed to the jury without the need of an expert. In his opening and closing argument, Attorney Butters asserted that Iacaboni was "playing along," "puff[ing]" and "bullshitting" Albertelli and that Iacaboni was actually trying to stop the arson from occurring. During the cross-examination of Agent Kelsch, Attorney Butters explicitly suggested that petitioner was "making it up" when he told Albertelli that he had recruited two people to perform the arson. He also moved to limit the testimony of Agent Kelsch. The jury rejected Iacaboni's version of the story, however, and found that the government had proven his guilt beyond a reasonable doubt.

Counsel's failure to hire an expert forensic linguist falls comfortably within the standard of objectively reasonable

-11-

conduct.  Moreover, petitioner has not been able to demonstrate that such omission was prejudicial to him.

### 3. Failure to cross-examine Sergeant Russolillo sufficiently

Iacaboni contends that Attorney Butters rendered ineffective assistance by failing to call MSP Sergeant Pasquale Russolillo ("Sergeant Russolillo") as a defense witness to interrogate him about the arson calls.  Sergeant Russolillo supervised the wiretap investigation and was also a witness for the prosecution on other matters at the trial.  Specifically, petitioner contends that his trial counsel should have elicited testimony from Sergeant Russolillo that the government had initially believed that Iacaboni recruited Homsi to commit the arson because that would have shown that the First Superseding Indictment was erroneous and, by extension, cast doubt on the credibility of the Second Superseding Indictment.

Attorney Butters bolsters petitioner's claim by stating in his affidavit that

> [he] failed to follow through and present [his] proposed defense of bringing all of the government's incorrect theories over a period of three years about Mr. Iacaboni's alleged involvement in the Arson Conspiracy to the jury's attention...

Despite counsel's retrospective mea culpa, the Court concludes that his failure to raise the government's prior discarded theory of Iacaboni's involvement with the arson was

-12-

neither constitutionally deficient nor prejudicial to petitioner's case. The prosecution's initial interpretation of the arson calls was formed prior to Homsi's decision to plead guilty and cooperate with the government. Upon hearing Homsi's explanation that he had communicated with Albertelli and not with Iacaboni, the prosecution realized that Iacaboni played a somewhat different role in the arson. There is nothing exculpatory about the fact that new credible evidence clarifying the relationship between co-defendants led to a modification of the government's initial theory about Iacaboni's involvement.

Even if attorneys were required to present all the defenses available to their clients, which they are not, Iacaboni has failed to show that the verdict would have been different had the jury been informed that the government initially believed that Iacaboni was even more criminally involved than he was.

### 4. Failure to draft a limiting instruction

Iacaboni asserts that Attorney Butters' failure to propose a limiting instruction regarding Gianelli's connection to organized crime constituted ineffective assistance of counsel. He argues that spillover prejudice resulting from the numerous references during trial to Gianelli's association with organized crime and mafia figures prejudiced the outcome of his own case.

The First Circuit has, however, already rejected that argument made by Iacaboni and two other defendants:

> As it happens, the jury acquitted two of the three defendants on racketeering-related charges, bearing out its ability to disregard any inference of guilt by association.

Albertelli, 687 F.3d at 451 (citing United States v. Flores-Rivera, 56 F.3d 319, 326 n. 2 (1st Cir. 1995)).

Although Attorney Butters admits that he could have challenged potential spillover prejudice more directly by bolstering his cross-examination of certain witnesses and drafting a limiting instruction to the jury, the Court perceives no prejudicial import.

### 5. Cumulative error

Courts may consider the cumulative effect of alleged deficiencies when conducting a Strickland analysis. See Rossetti v. United States, 773 F.3d 322, 331 (1st Cir. 2014).

Iacaboni avers that even if each alleged error made by Attorney Butters does not individually meet the Strickland standard of ineffective assistance, the cumulative weight of the errors does. Petitioner also suggests that Attorney Butters' performance was adversely affected by the coincidence of his own divorce proceedings and his mother's death. In his declaration, Attorney Butters denies that any personal marital difficulties affected his representation but claims that his mother's declining health and subsequent death did affect him more than he realized at the time.

Petitioner cites United States v. Correia, 2002 WL 31052766, at *5 (D. Mass. Sept. 13, 2002) aff'd, 77 F. App'x 12 (1st Cir. 2003), in which trial counsel was found to have provided ineffective assistance following a six-day jury trial that resulted in defendant's arson conviction. United States District Judge Rya Zobel determined that counsel performed deficiently "based on the combined effect of all defense counsels' errors." Id. at *1.

Correia, however, is inapposite for at least two reasons. First, trial counsel in that case failed to call a witness to testify to "objectively apparent" pivotal exculpatory evidence of which counsel was aware at the time of trial. Id. at *2. The government's case largely depended upon proving that defendant deactivated the fire alarm in the building. As it turns out, the alarm in question was in fact a burglar alarm and the building did not have a fire alarm. Even though counsel was aware of that fact, such "highly exculpatory" evidence which would have likely changed the outcome of the case was never presented. Id. at *3. There is no analogous exculpatory evidence that Attorney Butters failed to present here.

Second, the deficiencies in counsel's representation of Correia were so apparent that Judge Zobel raised the issue of ineffective assistance of counsel sua sponte based on her "observations of defendant's attorneys during the six-day trial"

-15-

as well as during post-trial motions. Id. at *1.  No such egregious errors were made in the presence of the presiding judicial officer during the course of Iacaboni's relatively lengthy trial.

The Court recognizes that this is an unusual case wherein trial counsel has submitted an affidavit readily admitting to various deficiencies in his representation.  It does not question the veracity or sincerity of the declaration but recognizes that, with the benefit of hindsight, attorneys frequently may second guess their performances that could have been improved upon.  It is for that very reason that

> a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Strickland, 466 U.S. at 689.

The Court further notes that the submission is perhaps additionally motivated by the close personal friendship between Attorney Butters and the petitioner over the past 30 years.  Our jurisprudence does not afford a defendant "a second bite of the apple" simply because his attorney willingly admits his own ineffective assistance after vigorously representing defendant at trial with an objectively reasonable strategy that ultimately proves to be unsuccessful.

Upon consideration of the cumulative effect of Attorney Butters' alleged deficiencies, the Court concludes that Iacaboni has failed to demonstrate that the representation provided by his trial counsel fell below an objective standard of reasonableness under prevailing professional norms.

Moreover, the First Circuit has already rejected Iacaboni's contention that he was convicted based on insufficient evidence:

> In short, no error flawed Iacaboni's conviction as to the arson and extortion counts....In closing...we note that the government had a strong case which it was difficult for the defendants to counter....There is no reason to believe here that innocent defendants have been convicted.

United States v. Albertelli, 687 F.3d 439, 451-52 (1st Cir. 2012). Even if Attorney Butters had avoided all of his alleged errors, petitioner has not shown that the outcome of his trial and subsequent appeal would have been any different.

### 6. Evidentiary hearing

A petitioner who files a § 2255 motion "is not entitled to an evidentiary hearing as a matter of right." David v. United States, 134 F.3d 470, 477 (1st Cir. 1998). There is a "fairly heavy burden" of proving that an evidentiary hearing is merited. See McGill, 11 F.3d at 225.

> [W]hen (1) the motion is inadequate on its face, or (2) the movant's allegations, even if true, do not entitle him to relief, or (3) the movant's allegations "need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible,"

the Court may forego a hearing. David, 134 F.3d at 477 (quoting United States v. McGill, 11 F.3d 223, 225-26 (1st Cir. 1993)). Furthermore, an evidentiary hearing is not required "where the district judge is thoroughly familiar with the case as, for example, when he presides at both a change of plea hearing and sentencing." Ouelette v. United States, 862 F.2d 371, 377 (1st Cir. 1988).

The Court concludes that an evidentiary hearing is unnecessary because 1) Iacaboni has failed to demonstrate that such a hearing is warranted and 2) the Court presided over the petitioner's jury trial and his sentencing. The record provides a sufficient basis for resolving the matter without an additional hearing.

## ORDER

Based upon the foregoing, defendant's Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody under 28 U.S.C. § 2255 (Docket No. 974) is **DENIED** and the petition is **DISMISSED.** The Court furthermore **DENIES** a Certificate of Appealability pursuant to 28 U.S.C. § 2253(c)(2).

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated March 16, 2015